United States Courts
Southern District of Texas
FILED
*July 27, 2025*
Nathan Ochsner, Clerk of Court

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v.  § | Criminal No. **4:25-cr-00347** |
| § | |
| RAMI ABUNAKIRA § | |
| § | |
| Defendant.  § | |

## INFORMATION

The United States Attorney charges:

### General Allegations

At all times material to this Information, unless otherwise specified:

### The Medicare Program

1. The Medicare Program ("Medicare") was a federally funded program that provided free and below-cost health care benefits to individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare & Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3. Medicare covered different types of benefits and was separated into different program "parts." Medicare "Part B" covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office

visits and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4. Medicare "providers" included independent clinical laboratories, physicians, and other health care providers who provided items or services to beneficiaries. To bill Medicare, a provider was required to submit a Medicare Enrollment Application Form ("Provider Enrollment Application") to Medicare. The Provider Enrollment Application contained certifications that the provider was required to make before the provider could enroll with Medicare. Specifically, the Provider Enrollment Application required the provider to certify, among other things, that the provider would abide by the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and that the provider would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

5. A Medicare "provider number" was assigned to a provider upon approval of the Provider Enrollment Application. A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for reasonable and necessary services provided to beneficiaries.

6. A Medicare claim was required to contain certain information, including: (a) the beneficiary's name and Health Insurance Claim Number; (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; (e) the name of the referring physician or other health care provider; and (f) the referring provider's unique identifying number, known either as the Unique Physician Identification Number or National Provider Identifier. The claim form could be submitted in hard copy or electronically.

7. When receiving and adjudicating claims, Medicare acted through fiscal intermediaries called Medicare Administrative Contractors ("MACs"), which were statutory agents of CMS for Medicare Part B. MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether a claim was for a covered service. To receive Medicare reimbursements, providers, including clinical laboratories, physicians, and others, who provided services to beneficiaries, needed to have applied to the assigned MAC and executed a written provider agreement. The Medicare provider enrollment application, CMS Form 855B, had to be signed by an authorized representative of the provider.

8. CMS Form 855B required providers to report any individuals with a five percent or greater direct or indirect interest along with any managing employees of the provider. Title 42 of the Code of Federal Regulations, Section 420.201 defined an ownership interest as "the possession of equity in the capital, the stock, or the profits of the disclosing entity."

9. When submitting claims to Medicare for reimbursement, providers were required to certify that: (a) the contents of the forms were true, correct, and complete; (b) the forms were prepared in compliance with the laws and regulations governing Medicare; and (c) the services that were purportedly provided, as set forth in the claims, were medically necessary.

10. Medicare claims were required to be properly documented in accordance with Medicare rules and regulations. Medicare would not reimburse providers for claims that were procured through the payment of illegal kickbacks and bribes.

### Medicare Coverage for Genetic Testing

11. Laboratories purported to offer genetic testing that used DNA sequencing to detect

mutations in genes that could indicate an increased risk of developing diseases including but not limited to cancer, cardiovascular disease, Parkinson's disease, Alzheimer's disease, dementia, and immunodeficiencies (collectively, "genetic testing"). All genetic testing was a form of diagnostic testing.

12. For genetic testing, a beneficiary provided a saliva sample or cheek or nasal swab containing DNA material. The DNA sample was then submitted to a laboratory to conduct genetic testing. Tests were then run on different "panels" of genes. Genetic testing typically involved performing lab procedures that resulted in billing Medicare using certain billing codes, each with its own reimbursement rate.

13. DNA samples were submitted along with requisitions (or the physician's order) that identified the beneficiary, the beneficiary's insurance, and indicated the specific type of genetic testing to be performed. For laboratories to submit claims to Medicare for genetic testing, the requisitions had to be signed by a physician or other authorized medical professional, who attested to the medical necessity of the genetic testing.

14. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "[e]xaminations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint, or injury." 42 C.F.R. § 411.15(a)(1).

15. If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "[A]ll . . . diagnostic laboratory tests . . . must be ordered by the physician who is treating

the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary[.]"

## The Relevant Entities

16. LabCare LLC ("LabCare") was a Texas limited liability company with a principal place of business in Dallas County, Texas. LabCare was an independent clinical laboratory enrolled with Medicare that purportedly provided laboratory services and diagnostic testing, including genetic testing, to individuals, including Medicare beneficiaries.

17. GeneTX Laboratory LLC ("GeneTX") was a Texas limited liability company with a principal place of business in Harris County, Texas. GeneTX was an independent clinical laboratory enrolled with Medicare that purportedly provided laboratory services and diagnostic testing, including genetic testing, to individuals, including Medicare beneficiaries.

18. Appolo Precision LLC ("Appolo") was a Texas limited liability company with a principal place of business in Harris County, Texas. GeneTX was an independent clinical laboratory enrolled with Medicare that purportedly provided laboratory services and diagnostic testing, including genetic testing, to individuals, including Medicare beneficiaries.

19. Marketing Company 1 was a Florida limited liability company with a principal place of business in Miami-Dade County, Florida.

## The Defendant and Relevant Individuals

20. Defendant **RAMI ABUNAKIRA** ("**ABUNAKIRA**") was a resident of Fort Bend County, Texas, and was a beneficial owner of GeneTX and Appolo. **ABUNAKIRA** was also the nephew of Individual 1.

21. Individual 1 was the owner and operator of multiple labs engaged in genetic testing that were the subject of a 2019 indictment, filed in the Eastern District of Louisiana, charging Individual 1 with, among other counts, conspiracy to commit health care fraud and wire fraud, and conspiracy to defraud the United States and to pay and receive illegal kickbacks (the "2019 Indictment"). As part of the conditions of his release, Individual 1 was prohibited from violating federal, state, or local law while on release and could not work in the medical field or health care field. Individual 1 absconded from the jurisdiction of the court in 2022.

22. Employee 1 was a resident of Harris County, Texas, and the nominee owner of GeneTX.

23. Individual 2 was a resident of Harris County, Texas, and the nominee owner of Appolo.

24. Individual 3 was a resident of Palm Beach County, Florida, and the owner of Marketing Company 1.

## COUNT ONE
**Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks**
**(18 U.S.C. § 371)**

25. Paragraphs 1 through 24 of this Information are realleged and incorporated by reference as though fully set forth herein.

26. Beginning in or around December 2022, and continuing through on or about March 5, 2025, the exact dates being unknown to the United States Attorney, in the Houston Division of the Southern District of Texas, and elsewhere, the Defendant,

**RAMI ABUNAKIRA**,

did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown, including Individual 1, Employee 1, Individual 2, and Individual 3, to commit offenses against the United States, that is:

    a. to defraud the United States by cheating the United States government and any of its agencies and departments out of money and property, and by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of HHS and CMS in its administration and oversight of Medicare;

    b. to violate Title 42, United States Code, Section 1320a-7b(b)(1), by soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check and interstate wire transfer, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare; and purchasing, leasing, ordering, and arranging for, and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare; and

    c. to violate Title 42, United States Code, Section 1320a-7b(b)(2), by offering and paying any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check and interstate wire transfer, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare; and purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering

any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, that is, Medicare.

## Purpose of the Conspiracy

27. It was a purpose of the conspiracy for **ABUNAKIRA** and his co-conspirators to unlawfully enrich themselves by, among other things: (a) falsifying and causing the falsification of Medicare enrollment forms, including Medicare Enrollment Applications and Forms CMS-855B, to conceal the beneficial ownership of, and managing control over, LabCare, GeneTX, and Appolo; (b) soliciting, receiving, offering, and paying kickbacks and bribes in exchange for the referral of Medicare beneficiaries' DNA samples and arranging for doctors' orders for genetic testing to LabCare, GeneTX, and Appolo; (c) submitting and causing the submission of false and fraudulent claims to Medicare for genetic testing that was procured through kickbacks and bribes, was medically unnecessary, and was ineligible for reimbursement; (d) concealing and causing the concealment of kickbacks and bribes; and (e) diverting the kickback and Medicare proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

## Manner and Means

28. The manner and means by which **ABUANKIRA** and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

   a. Individual 1 acquired a beneficial ownership interest in LabCare despite being prohibited from working in the health care field as a condition of release resulting from the 2019 Indictment.

   b. Individual 1 falsified and caused the falsification of a Medicare enrollment document, corporate records, and other documents to conceal his ownership and management of LabCare.

c. Individual 1 and **ABUNAKIRA** operated LabCare to bill Medicare for genetic testing that was predicated on illegal kickbacks while concealing from Medicare that Individual 1 and **ABUNAKIRA** were involved with LabCare, including while Individual 1 was a fugitive from justice.

d. **ABUNAKIRA** falsified and caused the falsification of Medicare enrollment document, corporate records, and other documents to conceal his ownership and management of GeneTX and Appolo.

e. **ABUNAKIRA** and others recruited Employee 1 as the nominee owner of GeneTX to conceal **ABUNAKIRA's** identity as a beneficial owner.

f. **ABUNAKIRA** and others recruited Individual 2 as the nominee owner of Appolo to conceal **ABUNAKIRA's** identity as a beneficial owner.

g. **ABUNAKIRA** and others operated GeneTX and Appolo to bill Medicare for medically unnecessary genetic testing that was predicated on illegal kickbacks while concealing from Medicare that **ABUNAKIRA** was involved with GeneTX and Appolo.

h. **ABUNAKIRA** and others obtained access to tens of thousands of beneficiaries across the United States by targeting them with deceptive telemarketing campaigns. Call center representatives—who were almost never medical professionals—often prompted beneficiaries to disclose their medical conditions and induced them to agree to genetic testing regardless of medical necessity.

i. **ABUNAKIRA** and others negotiated illegal kickback and bribe arrangements with marketers, and knowingly and intentionally disguised the nature and source of these illegal kickbacks and bribes through sham contracts and agreements that purported to provide that marketers would be paid on an hourly basis for legitimate marketing services.

j. **ABUNAKIRA** and others, through LabCare, GeneTX, and Appolo, offered to pay, and paid or caused the payment of, illegal kickbacks and bribes to marketers, in exchange for the referral of DNA samples and for the ordering and arranging for the ordering of genetic testing for Medicare beneficiaries by LabCare, GeneTX, and Appolo. Marketers receiving these kickbacks knew that LabCare, GeneTX, and Appolo billed Medicare for genetic testing that was purportedly provided on behalf of these beneficiaries and that was predicated on these illegal kickbacks and bribes.

k. In and around August 2024, Medicare issued a payment suspension for GeneTX. Shortly thereafter, in and around August 2024, **ABUNAKIRA** began to use Appolo to bill Medicare for medically unnecessary genetic testing that was predicated on illegal kickbacks. Appolo was located in the same office complex as GeneTX, employed many of the same employees as GeneTX, and paid many of the same marketers as GeneTX.

29. From in or around December 2022, and continuing through in or around February 2025, **ABUNAKIRA**, Individual 1, and others submitted and caused LabCare to submit approximately $10.3 million in false and fraudulent claims to Medicare for genetic testing that was often: (a) induced through kickbacks and bribes; (b) medically unnecessary; and (c) ineligible for reimbursement. In reliance on these representations, Medicare paid approximately $3.2 million on those claims.

30. From in or around September 2023, and continuing through in or around August 2024, **ABUNAKIRA** and others submitted and caused GeneTX to submit approximately $17.4 million in false and fraudulent claims to Medicare for genetic testing that was often: (a) induced through kickbacks and bribes; (b) medically unnecessary; and (c) ineligible for reimbursement. In reliance on these representations, Medicare paid approximately $11.4 million on those claims.

31. From in or around August 2024, and continuing through in or around February 2025, **ABUNAKIRA** and others submitted and caused Appolo to submit approximately $23.8 million in false and fraudulent claims to Medicare for genetic testing that was often: (a) induced through kickbacks and bribes; (b) medically unnecessary; and (c) ineligible for reimbursement. In reliance on these representations, Medicare paid approximately $18.9 million on those claims.

32. **ABUNAKIRA** and his co-conspirators used the funds they received from Medicare to benefit themselves and others, and to further the scheme.

## Overt Acts

33. In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Houston Division of the Southern District of Texas, and elsewhere, at least one of the following overt acts, among others:

   a. On or about May 2, 2023, **ABUNAKIRA** caused the submission of a CMS Form 855B falsely certifying that Employee 1 was the sole person with an ownership interest in GeneTX.

   b. On or about May 29, 2024, **ABUNAKIRA** cased the submission of a CMS Form 855B falsely certifying that Individual 2 was the sole person with an ownership interest in Appolo.

   c. On or about March 5, 2024, Employee 1, on behalf of GeneTX, signed a sham hourly marketing agreement with Individual 3 providing that Marketing Company 1 was to be paid a flat hourly rate of $200 per hour that was not based on the value or volume of patients referred; tests referred or performed; or amounts billed, collected, or reimbursed based on referrals from Marketing Company 1.

   d. On or about January 7, 2025, Appolo paid Marketing Company 1 a kickback of

approximately $8,630 that was based on a percentage of Medicare reimbursements to Appolo on genetic testing Marketing Company 1 referred to Appolo.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
### Payment of Kickbacks in Connection with a Federal Health Care Program
### (42 U.S.C. § 1320a-7(b)(2) and 18 U.S.C. § 2)

34. Paragraphs 1 through 24 and 27 through 33 of this Information are realleged and incorporated by reference as though fully set forth herein.

35. On or about the dates set forth below, the exact dates being unknown to the United States Attorney, in the Houston Division of the Southern District of Texas, and elsewhere, the Defendant,

**RAMI ABUNAKIRA,**

aiding and abetting, and aided and abetted by, others known and unknown to the United States Attorney, did knowingly and willfully offer and pay remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check and interstate wire transfer, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare; and to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, that is, Medicare as set forth below:

| COUNT | Approximate Date of Payment | Approximate Amount | Description |
|---|---|---|---|
| 2 | January 7, 2025 | $8,630 | Wire Transfer from Appolo's account at Bank of Texas to Marketing Company 1's account at Chase Bank |

In violation of Title 42, United States Code, Section 1320a-7b(b)(2) and Title 18, United States Code, Section 2.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. §§ 981(a)(1)(C), 982(a)(7), and 28 U.S.C. § 2461(c))

36. The allegations contained in Counts One and Two of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7); and Title 28, United States Code, Section 2461(c).

37. Upon conviction of the offenses set forth in Count One and Count Two of this Information, the Defendant, **RAMI ABUNAKIRA**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7) and Title 28, United States Code, Section 2461(c), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

38. Defendant **RAMI ABUNAKIRA** is notified that upon conviction, a money judgment may be imposed against him. If any of the property described above, as a result of any act or omission of the Defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property up to the amount of the money judgment pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

              UNITED STATES OF AMERICA, by

              NICHOLAS J. GANJEI
              UNITED STATES ATTORNEY


              LORINDA LARYEA
              ACTING CHIEF, FRAUD SECTION


              /s/ Andrew Tamayo
              ANDREW TAMAYO
              MONICA COOPER
              TRIAL ATTORNEYS
              FRAUD SECTION, CRIMINAL DIVISION
              U.S. DEPARTMENT OF JUSTICE